**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ROBERT NOCK, *an individual, on behalf of himself and all others similarly situated,* | * | |
| *Plaintiff,* | * | |
| v. | * | Civil Action No. RDB-24-662 |
| PALMCO ADMINISTRATION, LLC, d/b/a Indra Energy Administration, PALMCO POWER MD, LLC, d/b/a Indra Energy, PALMCO ENERGY MD, LLC, d/b/a Indra Energy, | * | |
| *Defendants.* | * | |

* * * * * * * * * * * * *

**<u>MEMORANDUM OPINION</u>**

This putative consumer-protection class action concerns unsolicited spam telemarketing calls allegedly made by or on behalf of Defendants PalmCo Administration, LLC, d/b/a Indra Energy Administration, PalmCo Power MD, LLC, d/b/a Indra Energy, and PalmCo Energy MD, LLC, d/b/a Indra Energy (collectively, "Indra" or the "Indra Defendants"). Plaintiff and putative class representative Robert Nock ("Plaintiff" or "Nock") alleges that the Indra Defendants violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227 *et seq.*, and corresponding Maryland law, MD. CODE ANN., COM. LAW §§ 14-301–02. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.[1] Now pending

[1] This Court has federal question jurisdiction under 28 U.S.C. § 1331 over Nock's TCPA claims (Counts I–III of the Amended Complaint (ECF No. 28)) as they plainly arise under federal law. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 377 (2012) (citing *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916)). The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Nock's Maryland law claims (Counts IV–VI) as they "are so related" to Nock's TCPA claims that they "form part of the same case or controversy."

before the Court is the Indra Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 179).[2]

The Court has reviewed the parties' submissions, and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). The Indra Defendants are entitled to summary judgment on each of Nock's claims because the only evidence Nock has of the telemarketing calls he received—recordings his attorney retrieved from a cloud-based server owned by an unidentified foreign actor—cannot be authenticated and thus cannot be produced in a form that would be admissible in evidence. *See* FED. R. EVID. 901; FED. R. CIV. PROC. 56(c). Furthermore, even if Nock's call recordings were admissible, the Indra Defendants are entitled to summary judgment on the merits of Nock's TCPA claims because: (1) none of the three calls can be directly or vicariously attributed to Indra; (2) even if the calls could be attributed to Indra, Indra maintained reasonable procedures for preventing telephone solicitations such that it is entitled to safe harbor protection; and (3) no artificial or prerecorded voice played during any of the three calls at issue. For the reasons previewed above and expounded upon below, the Indra Defendants' Motion for Summary Judgment (ECF No. 179) is GRANTED. Judgment shall be ENTERED for Defendants on all claims set forth in Plaintiff's Amended Complaint (ECF No. 28).

---

[2] The Indra Defendants' Motion for Summary Judgment appears on the docket in different iterations at ECF Nos. 171, 173, 177, and 179. ECF No. 171 was stricken by this Court's Order (ECF No. 176) dated June 25, 2026, granting the parties' Joint Motion to Strike (ECF No. 175) to allow Indra to incorporate Nock's proposed redactions. The Indra Defendants then refiled redacted copies of their Motion for Summary Judgment on June 25, 2026 (ECF No. 177); however, certain exhibits attached to Indra's initial Motion for Summary Judgment (ECF No. 171) were not docketed properly at the time of refiling. *See generally* (ECF No. 177). Accordingly, on July 16, 2026, Indra again refiled redacted versions of their Motion for Summary Judgment with all corresponding exhibits, *see* (ECF No. 179). The Indra Defendants identify docket entry 179 as their "operative" summary judgment motion. *See* (ECF No. 179). Accordingly, for clarity and consistency, the Court will refer only to ECF No. 179 when referencing Indra's Motion for Summary Judgment.

## BACKGROUND

### I. Factual Background

Nock's claims against the Indra Defendants arise from a series of three unsolicited spam telemarketing calls Nock received in 2021. *See generally* (ECF No. 28). Nock contends that the disputed calls originated from a Pakistan-based call center with whom the Indra Defendants had contracted to conduct telemarketing campaigns on Indra's behalf. (ECF No. 119 at 3–4). Accordingly, the Court first provides background on Indra's consumer marketing efforts before briefly recounting the calls Nock received.

#### A. Indra's Door-to-Door and Telesales Platforms

The Indra Defendants are collectively responsible for selling electricity and natural gas to consumers in Maryland and other states. (ECF No. 179-1 at 3). To market its services, Indra utilizes both door to door sales ("D2D sales") and outbound telemarketing channels ("telesales"). (*Id.*); *see also* (ECF No. 179-4 ¶ 3). Indra's D2D and telesales departments are kept entirely separate from one another. (ECF No. 179-4 ¶ 3). Indra does not share consumer call data with its D2D sales vendors, and Indra's D2D sales vendors are not authorized to place telephone calls on behalf of Indra. (*Id.* ¶ 4).

At all relevant times, Indra maintained internal control mechanisms to detect and address deviations from its authorized D2D sales practices. (ECF No. 179-2, Ex. H at 15:9–20; 19:6–21). Indra's D2D sales enrollment process utilized a third-party verification ("TPV") platform that captured GPS coordinates from the D2D sales agent's tablet or electronic device, which allowed Indra to confirm that each sale occurred near a customer's home. (*Id.* at 15:9–20; 19:6–21; 20:7–21:17; 43:18–44:10); (ECF No. 179-2, Ex. I at 60:4–25). Collection

of GPS data permitted Indra to identify sales tainted by a "distance concern," which occurred when a sales enrollment took place beyond a certain distance from the putative consumer's residence, thereby indicating a departure from standard D2D sales procedures.[3] (ECF No. 179-2, Ex. H at 19:6–20:16; 43:18–44:10). Additionally, recognizing that there are tools for evading location-based monitoring, Indra also placed quality-control calls to customers after enrollment. (*Id.* at 15:15–16:8); (ECF No. 179-4 ¶ 4). Indra's quality control calls sought to confirm that the customer desired Indra's services and that the sale took place at the customer's door. (ECF No. 179-2, Ex. I at 55:18–56:21); (ECF No. 179-4 ¶ 4).

Indra also maintains internal control mechanisms on its telesales side to ensure compliance with TCPA provisions. (ECF No. 179-4 ¶ 5). Indra maintains an internal do-not-call policy ("IDNC Policy") to track consumer requests not to receive telemarketing calls on Indra's behalf. (*Id.*). Indra's IDNC Policy states that its purpose is "[t]o provide steps for handling Do Not Call (DNC) requests," and it directs readers to "[f]ollow these guidelines when a customer states they want to stop receiving calls." *See* (ECF No. 189 *SEALED at 10–11). The Policy then sets forth "Call Handling Guidelines" for employees to follow when they receive a do not call request, including: (1) "[a]cknowledge the caller's frustration about the contact from Indra Energy," (2) "[r]eassure the caller right from the start that you will help them with their request," and (3) "[p]robe the caller to gather as much information [as] possible to complete the Do Not Contact request." (*Id.*). The Policy then ends with the directive,

---

[3] Sales tainted by a "distance concern" may be the product of a practice known as "slamming," which occurs when an enrollment is made without the consumer's knowledge or consent. (ECF No. 179-2, Ex. H at 19:15–20:16). Indra's internal control mechanisms, including collection of D2D sales agents' GPS location data, sought to prevent incidents of slamming. (*Id.*); (ECF No. 179-4 ¶ 4).

"[o]nce you have enough information, add the customer to the Do Not Call / Do Not Contact list." (*Id.*).

In addition to maintaining an IDNC Policy, Indra's Chief Marketing Officer, Jeff Rodgers, avers that "individuals placing calls on behalf of Indra are instructed about how the do-not-call policy works and are given a copy of the policy, which explains how to place individuals on the internal do-not-call list." (ECF No. 179-4 ¶ 7). Mr. Rodgers adds that Indra "honors all do-not-call requests" by placing individuals who so request on its IDNC list, and Indra "maintains a record of all requests not to be contacted," which it "honors [] unless and until someone affirmatively requests to be contacted at that number." (*Id.* ¶¶ 8–9). Finally, Mr. Rodgers explains that "Indra also subscribes to the national and Maryland do-not-call registries and regularly scrubs its outbound calling list against them." (*Id.* ¶ 12).

**B. Indra's Contract with NSL Marketing**

In January 2021, as part of its D2D sales platform, Indra entered into a Consulting Agreement ("Agreement") with NSL Marketing, LLC ("NSL"), a door-to-door marketing firm that assists various companies with sales of energy services. (ECF No. 179-5 ¶ 4). Under the Agreement executed between Indra and NSL, NSL agreed "to perform door to door solicitations of prospective customers on behalf of Indra." (ECF No. 179-5 ¶¶ 5–6); *see also* (ECF No. 179-5, Ex. A § 1(a)). The Agreement further provided that NSL was an independent contractor with no authority to bind Indra by acting on Indra's behalf. (ECF No. 179-5, Ex. A § 9(a)); *see also* (ECF No. 179-5 ¶ 5 ("NSL was never an employee, joint venturer, partner, or any sort of general authorized agent of Indra. The scope of work that NSL contracted with Indra was limited to that expressly outlined in the services contract.")). Although NSL was a

contractor of Indra, NSL retained responsibility for directing and controlling its subcontractors' performance under the Agreement, including responsibility for sales training and supervision. (ECF No. 179-5, Ex. A § 9(b)).

While NSL maintained direct responsibility for the work of its subcontractors, Indra's Consulting Agreement with NSL included additional provisions broadly outlining boundaries on the scope of NSL's authority. *See* (*id.* §§ 1(a), 6(a), 9(d)–(f)). Specifically, the Agreement expressly required NSL to comply with all applicable laws and regulations. (*Id.* § 6(a)); *see also* (ECF No. 179-5 ¶ 9 (declaring NSL agreed to comply with all applicable laws under the Agreement, "includ[ing] any and all applicable TCPA, Do Not Call, or Do Not Visit laws and regulations" (internal quotation marks omitted))). The Agreement also required NSL to ensure that its subcontractors each pass a background check, carry Indra-approved badging and identification, and wear an Indra-approved uniform. (ECF No. 179-5, Ex. A §§ 9(d)–(f)). Finally, the Agreement specifically limited NSL's authority to conducting D2D sales, rather than telesales, on behalf of Indra. (ECF No. 179-5 ¶ 8 ("The [A]greement did not authorize NSL to engage in telemarketing, outbound calling, robocalling, or any other form of telephone solicitation on Indra's behalf. . . . Nor did Indra ever otherwise authorize NSL to engage in telemarketing on its behalf.")). NSL formally began D2D sales marketing for Indra under the Agreement on May 17, 2021. (ECF No. 179-1 at 6).

**C. NSL's Subcontractors Initiate a Telemarketing Scheme on Indra's Behalf**

On June 7, 2021, while NSL was serving as a D2D sales contractor for Indra, NSL

subcontractors created a rogue telesales scheme[4] in which they recruited or otherwise engaged individuals located in Pakistan to consummate faux D2D sales for Indra. *See* (ECF No. 179-2, Ex. J at 94:4–97:25); (ECF 179-2, Ex. L at 170:14–173:2); (ECF No. 179-2, Ex. M at 36:2–39:13). This form of sales fraud or scheme is allegedly accomplished by "spoofing" or obscuring the sales agent's location, making it appear as though the agent is at the consumer's door executing a sale rather than operating from a remote location. (ECF No. 179-2, Ex. H at 70:5–71:20); (ECF No. 179-2, Ex. J at 93:3–11). The person conducting the "spoofing" must manually or affirmatively activate the spoofing technology to conceal their true location; otherwise, internal control mechanisms are able to identify the discrepancy in locations. (ECF No. 179-2, Ex. I at 57:6–58:4).

Indra identified the infiltration of NSL's network through its collection of D2D sales agents' GPS data, which showed that a D2D sale had been consummated on Indra's behalf by a sales agent located 7,000 miles away from the consumer's residence. (ECF No. 179-2, Ex. I at 113:9–115:7); (ECF No. 179-2, Ex. H at 56:8–57:18). Prior to reviewing its D2D sales GPS data, Indra was unaware that NSL subcontractors were executing fraudulent D2D sales in Indra's name. (ECF No. 179-2, Ex. I at 54:11–55:3); (ECF No. 179-2, Ex. L at 150:9–14; 182:12–17); *see also* (ECF No. 179-2, Ex. F at 8 ("So just remember, my company calls you tomorrow and they will . . . ask you some questions and you need to say yes only. And the company is Indra Energy, okay?"). Within days of identifying the unauthorized D2D sale,

[4] Robert Palmese, Indra's President and CEO, indicated in deposition testimony his uncertainty as to whether NSL directly hired subcontractors who eventually went rogue, or whether NSL's subcontractors in turn delegated their responsibilities to individuals located abroad. *See* (ECF No. 179-2, Ex. L at 22:6–23:1); (ECF No. 179-2, Ex. M at 37:10–39:13).

Indra opened an internal investigation, notified NSL of the infiltration, and deactivated all of NSL's Maryland sales representatives from Indra's systems, thereby cutting off their ability to enroll additional customers. (ECF No. 179-2, Ex. M. at 37:10–38:7); (ECF No. 179-2, Ex. P); (ECF No. 179-4 ¶¶ 5–6). No Maryland-based NSL sales representative made a D2D sale on Indra's behalf after June 8, 2021, the day following Indra's identification of the sales fraud. (ECF No. 179-4 ¶ 6). In addition to deactivating NSL's Maryland sales representatives, Indra also canceled and charged back to NSL consumer enrollments identified as tainted by the scheme. (*Id.* ¶ 7).

**D. Nock Receives Three Telemarketing Calls**

At some point prior to 2021, Nock placed both his mobile phone number and his residential landline number on the national Do-Not-Call ("DNC") registry. (ECF No. 188 *SEALED* at 23). Despite this, in May 2021, Nock received three unsolicited telemarketing calls which he claims were made by or on behalf of Indra. (ECF No. 183 at 10–11); (ECF No. 188 *SEALED* at 23–25); (ECF No. 189 *SEALED* at 441–450); *see generally* (ECF No. 28 ¶¶ 46–67). All three calls that Nock received featured a live caller and did not contain an artificial or prerecorded voice. (ECF No. 183, Exs. 167, 209, 213 (on file with chambers)).

The first call was made to Nock's cellphone on May 18, 2021. (ECF No. 179-2, Ex. G at 56:8–57:13). The caller started the call by stating, "Yeah, hello, this is Happy, how are you?" to which Nock responded, "Don't ever call me again, yeah okay? You stupid asshole." (ECF No. 179-2, Ex. B). The first call only lasts eight seconds. (*Id.*). The second call was made to Nock's landline on May 26, 2021. (ECF No. 179-2, Ex. G at 58:21–59:11). The call lasts for thirty seconds and consists only of background noise and a mention of the name "Frederick

Johnson." (ECF No. 179-2, Ex. D). In neither of the first two calls did the caller mention Indra. *See* (ECF No. 179-2, Exs. B & D).

The third call was made to Nock's landline on May 27, 2021. (ECF No. 179-2, Ex. G at 60:16–62:22). The third call lasts eight minutes and begins with the caller asking for Frederick Johnson, a fake name Nock uses when engaging with telemarketers. (ECF No. 179-2, Ex. G at 99:3–100:11); (ECF No. 179-2, Ex. F). The remainder of the call consists of Nock providing the caller with his utility account numbers, home address, and completing the caller's enrollment process. (ECF No. 179-2, Ex. F). At the end of the call, the caller explicitly tells Nock, "[J]ust remember, my company calls you tomorrow and they will . . . ask you some questions and you need to say yes only. And the company is Indra Energy, okay?" (*Id.*). Once again, this call did not contain an artificial or prerecorded voice.

**E. Nock's Attorney Obtains Recordings of the Disputed Telemarketing Calls**

Nock did not record or take contemporaneous notes of the phone calls he received. (ECF No. 179-2, Ex. G at 53:20–54:7; 55:19–56:7; 62:12–63:19). Instead, while litigating an unrelated TCPA case, Nock's attorney was forwarded a Dropbox link from his co-counsel which contained a spreadsheet of call logs produced by a dialer[5] in response to a subpoena. (ECF No. 179-2, Ex. K at 36:2–37:9). The spreadsheet provided links to recordings of the calls at issue *in that case*. (*Id.* at 20:3–22:11). Nock's attorney followed the links provided in the spreadsheet and learned that recordings of the calls in that case were publicly available on

[5] A dialer is a form of software that automates outbound calling for sales teams. The Court understands that, in Nock's prior case, Nock represented a plaintiff that sued one entity for violations of the TCPA, the defendant-entity placed blame for the alleged TCPA violations on its marketing subcontractor, and the marketing subcontractor in turn had a contract with the dialer platform. *See* (ECF No. 179-2, Ex. K at 21:7–22:11). The dialer platform is the entity which maintained and later produced the spreadsheet of call logs. (*Id.* at 25:22–27:9; 34:6–35:17).

a server which *also* contained recordings of *other* telemarketing calls. (*Id.* at 20:3–22:11; 23:6–17; 27:4–29:21). Some of the recordings located on the server were password protected, while others were not. (*Id.* at 29:22–31:7). After this discovery, Nock's attorney used wget scripts[6] that he wrote himself using "[a] lot of Google and some trial and error" to download the contents of the server and store them in TAR files[7] on his computer, though his computer crashed "a couple of times" during the downloading process. (*Id.* at 10:13–18; 79:18–81:5; 105:3–21; 121:1–10). He then discovered recordings of the calls at issue in this case at some point during the second half of 2021. (*Id.* at 64:3–65:8).

While obtaining recordings of the calls at issue in this case, Nock's attorney did not communicate directly with the dialer entity who produced the calls logs in his prior case, nor did he send the dialer a preservation notice or ask the dialer or its clients for permission to access recordings of other calls on the server. (ECF No. 179-2, Ex. K at 28:14–30:22; 33:5–35:17). Nock's attorney assumed that the dialer knew that recordings of unrelated telemarketing calls not linked on the spreadsheet were *also* publicly available and that the dialer intended for those other calls to be publicly available. (*Id.* at 30:12–34:19; 37:4–39:10). According to Nock's attorney, the entity which produced the spreadsheet, and clients of that entity, "had to know" that the recordings were accessible by "[a]nybody who's online" because that is a "known feature" of dialers. (*Id.* at 30:5–34:19; 37:4–39:10; 40:22–41:15). Furthermore, Nock's attorney did not take contemporaneous notes of his process for

---

[6] A "wget script" is a piece of code used to retrieve files from web servers. (ECF No. 179-1 at 8 n.3); (ECF No. 179-2, Ex. K at 111:17–113:2). The script can operate in the background, i.e., without the user's active interaction, making it useful for downloading large files or mirroring websites.

[7] A TAR file is an archive file that bundles multiple files together, similar to a ZIP folder. (*Id.* at 8 n.4).

preserving the files, nor did he take a screen recording of the server or otherwise document the sites he visited and steps he followed to extract the files. (*Id.* at 85:17–88:6).

Plaintiff ultimately attributes the server (and the calls made to Nock) to Mohsin Abdul Jabbar ("Jabbar"), a Pakistani call center operator, and a company called AJ Solutions. (*Id.* at 48:1–50:18). This connection is based on a review of GPS data underlying some of Indra's tainted enrollments. (*Id.* at 48:1–20). According to Plaintiff, that GPS data leads to the same building in Pakistan that was identified through discovery in one of Plaintiff's attorney's prior TCPA cases as belonging to Jabbar and AJ Solutions. (*Id.* at 48:1–50:3). However, Plaintiff draws this conclusion based on a review of Google Maps; Plaintiff has not personally visited the building in Pakistan, nor does he know whether other businesses operated out of the same building. (*Id.* at 48:1–50:18). In addition, Plaintiff points to email traffic between Jabbar and NSL as further evidence that Jabbar and AJ Solutions were responsible for the calls made to Nock. (*Id.* at 55:24–57:19); *see also* (ECF No. 189 *SEALED* at 509–881). However, Plaintiff has not reviewed the contents of those emails, has not sent Jabbar or AJ Solutions a subpoena or a preservation letter, and has never communicated directly with Jabbar or AJ Solutions to confirm the nature of their relationship, if any, with Indra and NSL. (*Id.* at 52:4–53:13; 55:24–57:19; 110:21–111:10).

## II. Procedural History

On March 5, 2024, Nock initiated this action by filing in this Court a six-Count Complaint against the Indra Defendants. (ECF No. 1). On April 30, 2024, the Indra Defendants moved to dismiss Nock's Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). (ECF No. 20). On June 10, 2024, Nock filed the

operative Amended Complaint (ECF No. 28), alleging that he received unsolicited spam telemarketing calls from or on behalf of the Indra Defendants which violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227 *et seq.* (Counts I–III), and its Maryland analog, the Maryland Telephone Consumer Protection Act ("MDTCPA"), MD. CODE ANN., COM. LAW §§ 14-301–02 (Counts IV–VI). On July 8, 2024, all three Indra Defendants answered the Amended Complaint. *See* (ECF Nos. 31, 32). As a result, on February 24, 2025, this Court denied the Indra Defendants' Motion to Dismiss as mooted by their answers to the Amended Complaint. (ECF No. 78). This case then proceeded to discovery.

While the parties were engaged in discovery, Nock filed a Motion to Consolidate this case with *Nock v. Spring Energy RRH, LLC*, (No. RDB-25-2809) (ECF No. 107), which this Court denied by Memorandum Opinion dated December 17, 2025.[8] (ECF No. 135). Thereafter, on June 25, 2026, the Indra Defendants filed a Motion for Summary Judgment (ECF No. 179). Nock has responded in Opposition (ECF No. 183), and the Indra Defendants have replied (ECF No. 194). The parties' submissions have been reviewed, and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons set forth below, the Indra Defendants' Motion for Summary Judgment (ECF No. 179) is GRANTED.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant

[8] The present action is one of three nearly identical cases filed by Nock concerning alleged violations of the TCPA. *See Savada v. RRH Energy Servs., LLC* (No. RDB-25-1156); *Nock v. Spring Energy RRH, LLC* (RDB-25-2809). In each case, Nock contends that he received spam telemarketing calls from a Pakistan-based call center that was used by each defendant around the time he received the disputed calls. *See* (ECF No. 135 at 2). As a recitation of the procedural history underlying these cases appears in this Court's Memorandum Opinion denying Nock's Motion to Consolidate, the Court does not repeat that account here. *See* (ECF No. 135 at 2–6).

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a court's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Judd*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *accord Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (citing *Anderson*, 477 U.S. at 249).

If the moving party establishes that there is no evidence to support an element of the non-movant's case, the burden then shifts to the non-movant to proffer specific facts to show

a genuine issue exists for trial. *Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011). To survive summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That is, the nonmoving party bears the burden to submit evidence that is "significantly probative" as to a genuine issue of material fact. *Anderson*, 477 U.S. at 249–50. However, the nonmoving party "may not create a genuine issue of material fact through mere speculation, or building one inference upon another." *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999) (citing *Anderson*, 477 U.S. at 255).

Furthermore, the non-movant "must produce competent evidence on each element of his or her claim." *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). Competent evidence means evidence in such a form as would be admissible at trial. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993). If the non-movant fails to produce competent evidence as to each element of its claim, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Casey*, 823 F. Supp. 2d at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

## ANALYSIS

Nock claims that he received three unsolicited telemarketing calls in May 2021 in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227 *et seq.* (Counts I–III), and its Maryland analog, the Maryland Telephone Consumer Protection Act ("MDTCPA"), MD. CODE ANN., COM. LAW §§ 14-301–02 (Counts IV–VI). In their Motion for Summary Judgment (ECF No. 179), the Indra Defendants argue that Nock's claims must

fail because the only proof he has of the calls cannot be produced in a form that would be admissible in evidence. (ECF No. 179-1 at 10–19). The Indra Defendants further contend that, even if Nock's recordings of the calls were admissible, he cannot establish the remaining elements of his TCPA claims, and in any event, he cannot attribute the calls to Indra. (*Id.* at 19–30).

Congress passed the TCPA in response to "[v]oluminous consumer complaints about abuses of telephone technology." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370–71 (2012). The purpose of the TCPA and corresponding state statutes are to protect consumers against "the proliferation of intrusive, nuisance [telemarketing] calls to their homes." *Mims*, 565 U.S. at 372. Congress further authorized the Federal Communications Commission ("FCC") to implement rules and regulations enforcing the TCPA. 47 U.S.C. § 227(b)(2).

In Count I, Nock alleges that the calls violated TCPA protections afforded to cellphone and residential landline numbers listed on the national do-not-call ("DNC") registry. *See* 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c). In Count II, Nock alleges that Indra failed to maintain an internal do-not-call ("IDNC") list or train its personnel to use an IDNC list in violation of 47 C.F.R. § 64.1200(d). In Count III, Nock alleges that the calls violated TCPA protections which prohibit calling cellphones or landlines using an "artificial or prerecorded voice." *See* 47 U.S.C. § 227(b)(1)(A)–(B). Before turning to the merits of Nock's claims, the Court first addresses a fundamental threshold issue of evidentiary authenticity.

## I. Authentication

The Indra Defendants argue that Nock's TCPA claims must fail because the only evidence he has of the calls—recordings downloaded from a foreign server—cannot be

authenticated and thus "cannot be presented in a form that would be admissible in evidence" at trial. (ECF No. 179-1 at 10–16); *see also* FED. R. CIV. PROC. 56(c). Federal Rule of Evidence 901(a) provides that, to satisfy the requirement of authenticating an item of evidence, the proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." In this context, the Court's "role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) (collecting cases). However, the "factual determination of whether evidence *is* that which the proponent claims is ultimately reserved for the jury." *Id.* (emphasis added) (citing *United States v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992)).

In the Fourth Circuit, "[t]he burden to authenticate is not high—only a *prima facie* showing is required." *Id.* This *prima facie* showing "may be accomplished largely by offering circumstantial evidence" that the evidence in question is what it purports to be. *Id.* at 350. Similarly, the Fourth Circuit has recognized that "a proponent need not establish a perfect chain of custody or documentary evidence to support [] admissibility." *United States v. McCaslan*, No. 24-4670, 2026 WL 1650984, at *6 (4th Cir. June 8, 2026) (quoting *Vidacak*, 553 F.3d 344, 350 (4th Cir. 2009)). The chain-of-custody rule is not an "iron-clad requirement," rather, it is "but a variation of the principle that real evidence must be authenticated prior to its admission into evidence." *United States v. Howard-Arias*, 679 F.2d 363, 366 (4th Cir. 1982). "Therefore, the ultimate question is whether the [evidence of] authentication [] was sufficiently complete so as to convince the court that it is improbable that the original item had been exchanged with another or otherwise tampered with." *Id.*

Federal Rule of Evidence 901(b) sets forth an exemplary list of evidence that satisfies the authentication requirement. One of the most common forms of authentication evidence is the testimony of a witness with knowledge of the item. FED. R. EVID. 901(b)(1). "Courts considering the admissibility of electronic evidence frequently have acknowledged that it may be authenticated by a witness with personal knowledge." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 545 (D. Md. 2007) (Grimm, J.) (collecting cases). However, in using witness testimony to authenticate electronic evidence, Judge Grimm of this Court has cautioned:

> It is necessary [] that the authenticating witness provide factual specificity about the process by which the electronically stored information is created, acquired, maintained, and preserved without alteration or change, or the process by which it is produced if [the item is] the result of a system or process that does so, as opposed to boilerplate, conclusory statements that simply parrot the elements of the business record exception to the hearsay rule.

*Id.* at 545–46.

Other acceptable methods of evidence authentication include (i) identification based on distinctive characteristics of the item, (ii) voice identification testimony, and (iii) evidence describing a process or system, including that the process or system produces an accurate result. FED. R. EVID. 901(b)(4), (5), (9). Authentication based on distinctive characteristics is "one of the most frequently used to authenticate e-mail and other electronic records," including "text messages and the content of websites." *Lorraine*, 241 F.R.D. at 546. One method of authenticating electronic evidence under Rule 901(b)(4) is the use of "hash values,"[9]

[9] More specifically, a hash value is:

> A unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm applied to the characteristics of the data set. The most commonly used algorithms, known as MD5 and SHA, will generate numerical values so distinctive that the chance that any two data sets will have the same hash value, no matter how similar they appear, is less than one in one billion. 'Hashing' is used to guarantee the

a unique numerical identifier which can be "inserted into original electronic documents when they are created to provide them with distinctive characteristics" that will permit their identification under Rule 901(b)(4). *Lorraine*, 241 F.R.D. at 546–47. Alternatively, another method for authenticating electronic evidence under Rule 901(b)(4) is the use of metadata. Metadata is "[i]nformation about a particular data set or document which describes how, when, and by whom the data set or document was collected, created, accessed, or modified."[10] *Lorraine*, 241 F.R.D. at 547 (quoting FEDERAL JUD. CTR., MANAGING DISCOVERY OF ELECTRONIC INFORMATION: A POCKET GUIDE FOR JUDGES 24–25 (2007)). "Because metadata shows the date, time, and identity of the creator of an electronic record, as well as all changes to it, metadata is a distinctive characteristic of all electronic evidence that can be used to authenticate it under Rule 901(b)(4)."[11] *Id.*

In this case, the Indra Defendants contend that Nock's claims must fail because the only evidence he has of the telemarketing calls he received are three recordings which cannot be authenticated and thus would not be admissible in *any* form. *See* (ECF No. 179). When a

---

authenticity of an original data set and can be used as a digital equivalent of the Bates stamp used in paper document production.

*Lorraine*, 241 F.R.D. at 546–47.

[10] Common examples of metadata include "a file's name, a file's location . . . , file format or file type, file size, file dates (e.g., creation date, date of last data modification, date of last data access, and date of last metadata modification), and file permissions." *Lorraine*, 241 F.R.D. at 547 (quoting *Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 646 (D. Kan. 2005)).

[11] The Court notes several caveats to this broad statement. Though metadata offers a useful way for identifying distinct items of evidence, metadata "is not foolproof" and reliance on it alone carries inherent risks. *Lorraine*, 241 F.R.D. at 548. Specifically, a document or item "located on a networked-computer system can be viewed by persons on the network who may modify it." *Id.* (quoting JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 900.01[4][a] (Joseph M. McLaughlin ed., Matthew Bender 2d 3d. 1997)). Additionally, an item's metadata may reflect that it was modified by saving the item to a different location, or an unauthorized user may access a network (either by overriding security requirements or by accessing an unattended computer) and modify the materials thereon. *Id.*

party objects to evidence proffered in support of or opposition to summary judgment on admissibility grounds, the burden shifts to the proponent of the evidence to "show that the material is admissible as presented or to explain the admissible form that is anticipated." *Williams v. Silver Spring Fire Dep't*, 86 F. Supp. 3d 398, 407 (D. Md. 2015). In response, Nock asserts that he can authenticate the call records by testifying from his own memory, combined with circumstantial evidence of Indra's actual enrollment records and Indra's internal do-not-call ("IDNC") list.[12] (ECF No. 183 at 11–13). Nock does not argue that he can produce the recordings in a different, admissible format. *See generally* (ECF No. 183).

Though the bar to authenticate evidence is not high, Nock has failed to meet it. Nock's only evidence of the telemarketing calls at issue are three recordings that his counsel retrieved months later from a cloud-based server allegedly maintained by a foreign actor with whom Nock's attorney has never had direct contact. The recordings were not produced in response to a subpoena or a preservation notice; rather, they were discovered by Nock's attorney during

---

[12] The Court addresses this argument at the outset, in light of the length of its forthcoming discussion about enumerated methods of authentication under Rule 901. Nock contends that "many" of the call recordings he has produced contain consumer names and other identifying information that correlate with Indra's IDNC list and enrollment records, thus providing circumstantial evidence of Indra's responsibility for the calls. (ECF No. 183 at 12). Specifically, Nock points to three recordings in which the phone number called was placed on Indra's IDNC list: one phone number on the same day, one a day later, and one five days later. *See* (ECF No. 185 at 20–21). Similarly, Nock points to fourteen calls in which the phone number called was later enrolled in Indra's system. (*Id.* at 21–22). To be sure, Nock produced 413,228 call recordings in this case. *See* (ECF No. 183, Ex. 149 (on file with chambers)). To the extent that Nock argues seventeen of 413,228 calls (or .00004%) constitute adequate circumstantial evidence to authenticate all of the calls, or even the calls made to Nock, Nock is incorrect. First, in three of the seventeen calls identified by Nock, the person receiving the call only provides their name. (ECF No. 185 at 21). It is entirely possible that an enrolled Indra customer also received an unrelated spam call, even if the enrollment occurred on the same day. Furthermore, even drawing all reasonable inferences in Nock's favor, the fact that seventeen calls correlate with Indra's records does not tend to establish who actually made the calls or maintained the server where the calls were stored—a fundamental bar to authentication discussed in depth below. Finally, none of the seventeen calls which circumstantially demonstrate Indra's responsibility were made to Nock, and Nock's information does not appear on Indra's IDNC list or enrollment records. Thus, the extrinsic evidence Nock identifies could at most be circumstantial evidence to support authentication of the seventeen calls Nock alleges contain overlapping consumer information; however, it does not support authentication of the calls made to Nock.

an exploratory search of the foreign server which Nock's attorney only located by using a spreadsheet produced *in discovery* in an *unrelated* case. Authentication issues abound. The Court takes each in turn.

First, Nock contends that he can authenticate the calls from his own memory. However, at his deposition, when pressed by Indra's counsel to state "everything" he remembers about the calls at issue, Nock provided a general summary of *other* telemarketing calls before twice lamenting that he "can't recall specific conversations . . . on a certain date three years ago." (ECF No. 179-2, Ex. G at 56:13–57:13; 58:4–13; 59:5–60:2; 62:2–19). Nock similarly replied that he could not recall: (i) the dates on which the calls were received; (ii) the phone numbers on which he received the calls; (iii) the phone numbers which made the calls to him; (iv) whether there was anyone else in his own presence when he received the calls; or (v) whether he followed the caller's prompt to "press one" during any of the calls. (*Id.* at 53:20–54:3; 55:1–14; 57:1–58:20; 60:4–18; 63:12–64:10). Nor did Nock take any contemporaneous notes or make recordings of the calls at issue in this case. (*Id.* at 52:16–53:4; 54:4–7; 62:20–63:3). Time and again Nock deferred answering and instructed Indra's counsel to ask his attorneys, not as an assertion of privilege, but because any information he had about the calls "would have come *from* [his] attorney." (*Id.* at 63:15–64:10). Indra's counsel then played a recording of a separate call to Nock from June 2022. (*Id.* at 71:10–14). When asked whether the voice on the call was his, Nock replied that "[i]t sounded like [his]," but when asked if he remembered the call, Nock replied that he did not. (*Id.* at 71:16–21).

Nock's deposition makes abundantly clear that he possesses no actual, independent memory of the three calls at issue in this case. Even if he could identify his own voice on the

recording with certainty, another permissible form of authentication evidence under Rule 901(b)(5), the fact remains that he could not identify the voice of the caller on the other end. *See United States v. Robinson*, 707 F.2d 811, 814 (4th Cir. 1983) ("All that is required is that the witness have the requisite familiarity with the *speaker's* voice." (emphasis added) (citing *United States v. Thomas*, 586 F.2d 123 (9th Cir. 1978))); *see also* (ECF No. 179-2, Ex. G at 57:5–58:13; 58:21–60:18 (indicating lack of knowledge as to what entity made the disputed calls)). Given Nock's conceded uncertainty as to whether the disputed calls were made by Indra, let alone the identity of the specific caller, the most that Nock could authenticate with his testimony is the fact that his own voice appears on the recordings. That is not sufficient, particularly where authentication of now five-year old recordings would require at least some "factual specificity about the process by which the electronically stored information is created, acquired, maintained, and preserved without alteration or change." *Lorraine*, 241 F.R.D. at 545–46.

In a similar vein, the testimony of Nock's attorney would not be sufficient to authenticate the recordings here. Neither Nock nor his attorney claim to know the identity of the callers so as to permit authentication by voice identification under Rule 901(b)(5). *See generally* (ECF No. 183); (ECF No. 179-2, Exs. G & K). Relatedly, testimony by Nock's attorney based on his personal knowledge of how he acquired the recordings cannot carry the day, either. Nock's attorney concedes he did not take contemporaneous notes of his process for preserving the files, nor did he take a screen recording of the steps he followed or a screenshot of the server's index page. *See* (ECF No. 179-2, Ex. K at 85:15–88:6). To facilitate mass downloads of the server's contents, Nock's attorney utilized a wget script that he wrote himself using "[a] lot of Google and some trial and error," and his computer crashed "a couple

of times" during the downloading process. (*Id.* at 10:13–18; 105:3–21; 121:1–10). Although Nock's attorney preserved a copy of the script he used to download the disputed recordings, the server no longer exists, so he would not be able to retrace his steps or testify to his personal knowledge of the server which actually stored the recordings.[13] (*Id.* at 12:6–17; 120:2–7).

Even if Nock's attorney could reproduce his method for acquiring the recordings step by step to completion, there is a much more fundamental authentication issue at play here: neither Nock nor his attorney can demonstrate who *created* the recordings, nor can they identify the person responsible for *maintaining* the server before the recordings were intercepted by Nock's attorney. Nock's attorney testified at deposition that the recordings were stored on a cloud-based server that was not password protected and was publicly accessible by "[a]nybody who's online." (ECF No. 179-2, Ex. K at 30:5–34:19; 37:4–39:10). Nock's attorney speculates that the server belonged to a foreign actor named Mohsin Abdul Jabbar ("Jabbar") and his company, AJ Solutions. (*Id.* at 48:1–50:18). However, this attribution rests solely on circumstantial evidence of similarities between GPS data and emails exchanged between NSL and AJ Solutions. *See* (ECF No. 189 *SEALED* at 38–426). Neither piece of evidence raises the inference that Nock's attorney asks this Court to draw.

Concerning the emails, Nock's attorney points to email traffic between NSL's CEO, Neil St. Louis, and AJ Solutions from 2019 to 2024 as evidence that AJ Solutions was responsible for the server (and thus for the calls made to Nock). *See* (ECF No. 189

[13] Relatedly, the fact that the server no longer exists means that Nock's attorney also could not authenticate the recordings under Federal Rule of Evidence 901(b)(9), which permits authentication based on "evidence describing a process or system and showing that it produces an accurate result." Whether Nock's attorney's process produces an accurate result is unverifiable because the result of his process has been deleted.

*SEALED* at 38–426). However, the actual content of the emails is unknown, and only seven emails were exchanged during the month of May 2021, when Nock received the disputed calls. (*Id.* at 272–79). Drawing every reasonable inference in Nock's favor, the emails at most demonstrate an ongoing line of communication between AJ Solutions and NSL, a firm that markets for various companies in addition to Indra. (ECF No. 179-5 ¶¶ 4, 10). The fact of email traffic alone does nothing to suggest that AJ Solutions maintained the disputed server or made the calls at issue, either on NSL's behalf or otherwise.

With respect to GPS data, Nock's attorney contends that the coordinates for Indra's fraudulent D2D enrollment in Pakistan lead to the same building that *he* identified in one of his prior cases as belonging to Jabbar and AJ Solutions. (ECF No. 179-2, Ex. K at 48:1–50:3). Critically, that case remains pending before this Court, *see Nock v. Spring Energy RRH, LLC*, (No. RDB-25-2809), and there has been no finding of fact as to AJ Solutions' control over the building or any adjudication of liability whatsoever. Counsel's assessment of AJ Solutions' ownership thus remains entirely speculation. What is more, Nock's attorney has never communicated directly with Jabbar or AJ Solutions in connection with either case, has no record of their control over the building via a lease or direct ownership, has never personally visited Pakistan so as to personally verify AJ Solutions' control, and cannot rule out the possibility that other businesses operate out of the same building. (ECF No. 179-2, Ex. K at 48:1–50:18; 52:4–53:13; 55:24–57:19; 110:21–111:10). The only connection to AJ Solutions, then, is counsel's representation that Indra received a fraudulent enrollment which, according to counsel's review of Google Maps, was initiated near the same place where a telemarketing

call originated in *Spring Energy*. Still, there is nothing in *this case* that links the building to AJ Solutions, or the server for that matter.[14]

To recount, the calls to Nock were made in May 2021, and the recordings of those calls remained on the server for several months until Nock's attorney downloaded them sometime in the second half of 2021. (ECF No. 179-2, Ex. K at 64:3–65:8). For several months, then, the recordings sat on a server maintained by an unknown foreign actor whom Nock's attorney cannot identify and with whom he has never had direct contact. (*Id.* at *Id.* at 52:4–53:13; 55:24–57:19; 110:21–111:10). During that time, the recordings were not password protected and were, in Nock's attorney's own words, accessible by "[a]nybody who's online." (ECF No. 179-2, Ex. K at 29:22–34:19; 37:4–39:10). Nock has not produced a records custodian, an access log, or even evidence of security measures to protect the legitimacy of the recordings during the months that they sat on the server prior to download. Nor has Nock's attorney produced a bona fide subpoena or preservation notice to demonstrate the authenticity of the recordings—indeed, he downloaded them himself from the internet just as "[a]nybody [else] who's online" could. (ECF No. 179-2, Ex. K at 30:3–11). Even assuming that Nock's attorney maintained the recordings in pristine condition from the moment he acquired them onward, no one can account for who created, maintained, accessed, or modified the recordings during the months before.

[14] At the risk of belaboring the point, the Court notes that, even if it credited all of Nock's evidence linking the Pakistani building to AJ Solutions, there is nothing linking the building to the calls made to Nock. The fact that *Indra* received a fraudulent enrollment which may have originated from that building in June 2021 says nothing about who made the calls to Nock in May 2021.

Although the Fourth Circuit does not require a perfect chain of custody, *Vidacak*, 553 F.3d at 350, it does require evidence of authenticity that is "sufficiently complete so as to convince the court that it is *improbable* that the original item had been exchanged with another or otherwise tampered with." *Howard-Arias*, 679 F.2d at 366 (emphasis added). This demonstration must include at least some "factual specificity about the process by which the electronically stored information is *created*, acquired, *maintained*, and *preserved without alteration or change*."[15] *Lorraine*, 241 F.R.D. at 545–46 (emphasis added). The specter of alteration or fabrication is inescapable when no one can account for who created the recordings or maintained the electronic platform where the recordings were stored. This is particularly so where, as here, the server which allegedly stored the recordings no longer exists, and the only person who can verify its existence in the first place is Nock's attorney, an indisputably interested party.[16]

---

[15] Although Nock's attorney accounts for the holes in his process by contending that downloading servers such as these is a "regularly conducted activity in [his] practice," (ECF No. 179-2, Ex. K at 10:19–12:4), he must do more than offer "boilerplate, conclusory statements that simply parrot the elements of the business record exception to the hearsay rule" to survive summary judgment on authenticity grounds. *Lorraine*, 241 F.R.D. at 545–46.

[16] The Indra Defendants aptly note that Maryland's Attorney Rules of Professional Conduct include a standard attorney-witness rule. *See* MARYLAND ATTORNEYS' RULE OF PROFESSIONAL CONDUCT 19-303.7 [hereinafter "MDRPC"]. MDRPC 19-303.7 provides that "[a]n attorney shall not act as advocate at a trial in which the attorney is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the attorney would work substantial hardship on the client." Given that Nock's attorney is the only person with personal knowledge of how the call recordings were acquired, the Court assumes without deciding that Nock's attorney would likely be considered a necessary witness at a trial in this matter. Relatedly, testimony about his acquisition of the recordings would *not* be considered testimony on an uncontested issue or testimony on the nature and value of legal services rendered. *See* MDRPC 19-303.7(a)(1)–(2). Thus, the Indra Defendants are correct in noting that, were this matter to proceed to trial, Nock's attorney's dual role may necessitate an inquiry into his potential disqualification. *See id.* cmt. 2 ("A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof.").

The foregoing demonstrates that testimony by a witness with personal knowledge and voice identification testimony are not viable grounds for Nock to authenticate the recordings in this case. In the case of electronic evidence, the most applicable remaining method for authentication under Federal Rule of Evidence 901 is that by distinctive characteristics, particularly by hash values or metadata. *See* FED. R. EVID. 901(b)(4). As the Court finds that neither distinctive characteristic will suffice to authenticate the recordings in this case, the Court only briefly discusses each in turn.

As explained above, a hash value is a unique numerical identifier which can be "inserted into original electronic documents when they are created to provide them with distinctive characteristics" that will permit their identification under Rule 901(b)(4). *Lorraine*, 241 F.R.D. at 547. Use of hash values can be beneficial when producing electronic evidence in discovery, as they create "a form of electronic 'Bates Stamp'" that helps denote the final or legally operative version of the evidentiary item. *Id.* In this case, Nock's attorney did just that—he created a hash signature for all the recordings he produced in this case in order to help easily distinguish the copies he produced, should any damage occur to the files later on. *See* (ECF No. 179-2, Ex. K at 116:22–118:3); *see also* (ECF No. 183, Ex. 272 (on file with chambers)). Though the Court acknowledges the effort put forth by Nock's attorney to preserve and uniquely mark the files he produced in discovery, the use of hash values at discovery does not resolve the unaccounted-for time between the creation of the files on the server and production in this case. If the hash values had been generated at the time the calls were recorded and stored on the server, the hash values would be some evidence that the files had not been modified since their creation, but that is not the case here.

Alternatively, an electronic item's metadata—information about how, when, and by whom an electronic item was collected, created, accessed or modified—is a distinctive characteristic sufficient to permit identification under Rule 901(b)(4). *See Lorraine*, 241 F.R.D. at 547 (citations omitted). However, in this case, because Nock's attorney downloaded the files onto his personal computer equipment, he asserts that most of the original metadata from the creation of the files did not transfer over. (ECF No. 179-2, Ex. K at 115:4–116:1); *see also Lorraine*, 241 F.R.D. at 548 (citing *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 530 (1st Cir. 1996) (discussing how an electronic item's metadata may reflect that the item was modified when the item was simply saved to a different location)). The only remaining metadata the Court can discern from the parties' submissions are the file names for each recording, which, according to Nock, support the files' authenticity. *See* (ECF No. 179-1 at 15); (ECF No. 183 at 15). The Court disagrees.

While the file name tends to support the authenticity of the first call, the file names explicitly refute the authenticity of the second two calls. Nock alleges that the first call was made to him on May 18, 2021, at 12:40 p.m. EST. *See* (ECF No. 28 ¶ 62); *see also* (ECF No. 189 *SEALED* at 440 (T-Mobile bill reflecting incoming call received at 12:39 p.m.)). The file name for this recording is "20210518-124014," which indicates the call was made on May 18, 2021, at 12:40:14 p.m., thereby supporting Nock's contention that the file is authentic. *See* (ECF No. 183, Ex. 167 (on file with chambers)). However, Nock contends that he received the second call on May 26, 2021, at 12:05 p.m. EST. *See* (ECF No. 28 ¶ 62). The file name for the second call is "20210526-220517," indicating that the call was made on May 26, 2021, at 22:05:17 (or 10:05:17 p.m.), or ten hours after Nock's alleged receipt of the call. *See* (ECF

No. 183, Ex. 209 (on file with chambers)). Similarly, Nock alleges that he received the third call on May 27, 2021, at 6:04 p.m. EST. *See* (ECF No. 28 ¶ 62). However, the file name for the third call is "20210527-160358," which indicates the call was made on May 27, 2021, at 16:03:58 (or 4:03:58 p.m.), two hours before Nock's alleged receipt of the call. *See* (ECF No. 183, Ex. 213 (on file with chambers)).

The only explanation Nock's attorney provides for the inconsistency in file names is his belief that the server from which he retrieved the calls ran on UTC time, which is five hours ahead of Eastern Standard Time.[17] (ECF No. 179-2, Ex. K at 120:8–17). However, this speculation would not account for *any* file name: the first file name matches the time the call was received at Eastern Standard Time, and the file names for the second two calls reflect a ten- and two-hour offset, respectively. *See* (ECF No. 183, Exs. 167, 209, 213 (on file with chambers)). To the extent that Nock also directs this Court's attention to Exhibit 148 (the server's index page) and Exhibit 149 (his entire TAR file of recordings) to his Opposition (ECF No. 183), **each of which contains 413,228 items** purportedly for this Court's review, his argument still fails. The "last modified" date on the index page roughly matches the time for the first call (12:43 p.m.), but it is one hour off for the second call (13:07, or 1:07 p.m.) and the third (19:16, or 7:16 p.m.). *See* (ECF No. 183, Ex. 148 (on file with chambers)). Similarly,

---

[17] Nock also sought to submit a declaration of an expert which purports to explain the differences in the times indicated in the file names. *See* (ECF No. 204); (ECF No. 188 *SEALED* at 28–61). However, discovery in this case concluded on April 1, 2026, *see* (ECF No. 165), and Nock submitted his expert's declaration as an exhibit in support of his Opposition to Defendants' Motion for Summary Judgment (ECF No. 183; ECF No. 188 *SEALED*) on August 27, 2026, without previously disclosing his expert. Accordingly, this Court struck Nock's expert declaration as untimely disclosed. *See* (ECF No. 205). The Court also notes that, to the extent Nock and his attorney disagree with this ruling, Nock's attorney had possession of the recordings for five years (including two-and-a-half years since this litigation ensued), during which he had ample time to retain and disclose an expert to explain the file names.

the "last modified" date on the TAR file roughly matches the time for the first call (12:43 p.m.), but it is one hour off for the second call (1:07 p.m.) and the third (7:16 p.m.). *See* (ECF No. 183, Ex. 149 (on file with chambers)). Nock provides no explanation for the varying offsets between the file names, the server's index page, and the TAR file. Thus, the only remaining measure of metadata from the original recordings also does not suffice to authenticate the calls in this case.

In sum, the method by which the call recordings in this case were acquired effectively prevents their authentication under Rule 901. In the absence of any direct or non-speculative circumstantial evidence demonstrating who created, maintained, or preserved the recordings without alteration or change for the months prior to their acquisition by Nock's attorney, Nock has failed to produce evidence sufficient to support a finding that the recordings at issue are true and accurate copies of telemarketing calls allegedly made to him by or on behalf of Indra in May 2021.

## II. The Merits

Even if Nock's recordings of the disputed calls would be admissible in some form, his claims under the TCPA fail on the merits, and his MDTCPA claims fall with his TCPA claims. *See Worsham v. Direct Energy Servs., LLC*, No. SAG-20-00193, 2021 WL 948819, at *3–4 (D. Md. Mar. 12, 2021) (granting summary judgment on all MDTCPA claims where predicate TCPA claims failed); *see also* MD. CODE ANN., COM. LAW §§ 14-301. Accordingly, as explained below, the Indra Defendants are entitled to summary judgment on all counts.

### A. Count I

In Count I of his Amended Complaint (ECF No. 28), Nock contends that the three unsolicited telemarketing calls he received violated the TCPA's prohibition on telemarketing calls made to cellphone and landline numbers registered with the national DNC registry. (ECF No. 28 ¶¶ 111–124); *see also* 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c). Section 227(c) of the TCPA and its implementing regulations create a private right of action for any person who has registered their phone number on the national do-not-call ("NDNC") registry and has "received more than one telephone call within any 12-month period by or on behalf of the same entity." 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c).

In their Motion for Summary Judgment, the Indra Defendants argue that they are entitled to summary judgment on Count I because only one call Nock received mentioned Indra's name. (ECF No. 179-1 at 29–30). They also argue that, notwithstanding the mention of Indra's name during one call, Nock has failed to attribute *any* of the three calls to Indra. (*Id.*). In response, Nock contends that he meets the more-than-one-call threshold because the call that mentioned Indra's name was made using the same spoofed number as another call he received. (ECF No. 183 at 23). Nock also argues that he has established Indra's vicarious liability for all three calls. (*Id.* at 25–28).

Before addressing the parties' arguments, the Court first notes that it agrees with Indra as it relates to its liability for the first call Nock received. Unlike the second two calls, which were both made to Nock's landline one day apart and originated from the same telephone number, the first call was to Nock's cellular telephone line eight days before the second call, lasted only eight seconds, did not mention Indra's name, and did not originate from the same

telephone number as the second two calls. *See* (ECF No. 179-2, Exs. B, D, G); (ECF No. 28 ¶ 62). The only thing connecting the first call to the others—let alone to Indra—is the fact that it was stored on the same server as the other two calls. *See* (ECF No. 183, Exs. 148 & 149 (on file with chambers)). However, the same server contained many recordings of calls that were not made on Indra's behalf, *see* (ECF No. 179-2, Ex. K at 102:20–103:18); (ECF No. 183, Ex. 149 (on file with chambers)), and as discussed at length above, there is a dearth of evidence demonstrating who owned the server. Thus, even if the second call to Nock shares some characteristics with the third call which mentioned Indra's name, Nock has failed to adduce evidence from which a jury could reasonably conclude that the first call was connected to the second two calls or to Indra. The Court therefore analyzes Indra's liability under Count I for the second two calls only.

A defendant may be held directly or vicariously liable for a violation of the TCPA. *Worsham v. Discount Power, Inc.*, No. RDB-20-0008, 2022 WL 3100762, at *5 (D. Md. Aug. 4, 2022); *see also* 47 U.S.C. § 227(c)(5) (providing a cause of action for persons who have received more than one unauthorized telemarketing call in a 12-month period "by *or on behalf of* the same entity" (emphasis added)). Here, the uncontroverted evidence shows that Indra does not make its own telemarketing calls; rather, it maintains contracts with various third-party marketing agencies. *See, e.g.*, (ECF No. 179-5, Ex. A). Thus, the Court analyzes whether Nock has adduced enough evidence to create a genuine issue of material fact as to Indra's vicarious liability for the calls in this case.

In their Motion for Summary Judgment, the Indra Defendants argue that they are entitled to summary judgment on Count I because they can at most be tied to only one call—

the third call—in which the caller mentioned Indra's name. (ECF No. 179-1 at 29–30). In response, Nock contends that he meets § 227(c)(5)'s more-than-one-call threshold because the call that mentioned Indra's name was made using the same spoofed number as another call he received. (ECF No. 183 at 23). Although Indra acknowledges that the second and third call originated from the same caller ID, Indra further asserts that common origin cannot render the second call Indra's because the dialer and its server were being used to conduct outright scams as well as calls on behalf of other companies.[18] (ECF No. 179-1 at 29–30). Finally, Indra contends that, notwithstanding the mention of its name during one call, it cannot be held vicariously liable for any of the three calls because Nock has failed to prove its conduct satisfies any applicable agency theory. (*Id.* at 23–30).

Having reviewed the arguments and evidence submitted by both sides, the Court finds that Nock has failed to proffer evidence that would allow a reasonable jury to find Indra vicariously liable for either of the last two calls he received. Even if both calls came from the same outgoing number, the bare reference to Indra on the third call is insufficient to raise a genuine dispute as to whether the caller was acting on behalf of Indra. *See Worsham v. Discount Power, Inc.*, No. RDB-20-0008, 2022 WL 3100762, at *8 (D. Md. Aug. 4, 2022) (noting that because it is the principal's manifestations "that are determinative under agency law," "a caller's assertion that she represented [the defendant] is insufficient standing alone to establish a principal-agent relationship under any applicable agency law theory" (citing *Auvil v. Grafton*

[18] Indra's point is well taken given that there were recordings on the same server of calls made on behalf of other companies. *See* (ECF No. 179-2, Ex. K at 102:20–103:18); (ECF No. 183, Ex. 149 (on file with chambers)). However, at this stage, the Court must draw all reasonable inferences in favor of Nock, and a reasonable jury could find that two calls made one day apart to the same landline and bearing the same caller ID were in fact made by the same caller. Whether there is a genuine dispute that the caller was acting on behalf of Indra is a different story, as discussed below.

*Homes, Inc.*, 92 F.3d 226, 230 (4th Cir. 1996))). As discussed at length above, Nock has produced no direct evidence that NSL made the disputed calls, and the only circumstantial evidence Nock proffers is the fact that (1) Indra experienced a fraudulent enrollment by an NSL subcontractor from Pakistan around the same time that Nock received the calls at issue here, and (2) the Pakistani building where the enrollment originated allegedly belongs to a foreign actor who is known to telemarket and with whom NSL's CEO exchanged emails, though the content of those emails is unknown. *See* (ECF No. 179-2, Ex. J at 94:4–97:25); (ECF No. 179-2, Ex. K at 48:1–50:18; 55:24–57:19); (ECF 179-2, Ex. L at 170:14–173:2); (ECF No. 179-2, Ex. M at 36:2–39:13); (ECF No. 189 *SEALED* at 509–881).

However, Nock's allegations concerning this obscure foreign actor and his propensity to telemarket from Pakistan amount to no more than Nock's attorney's speculation based on his review of discovery materials produced in *another case*. There is simply no evidence in *this case* connecting the foreign actor to Indra's fraudulent enrollment, to Pakistan, to the calls to Nock, or even to NSL, beyond emails exchanged with NSL's CEO. Thus, to connect the calls in this case to NSL, the Court is left only with: (1) one fraudulent enrollment in Indra's services by an NSL subcontractor around the time Nock was called, which Indra promptly addressed by deactivating NSL's rogue agent, thus negating its complicity in the alleged telemarketing scheme, *see* (ECF 179-2, Ex. L at 170:14–173:2); (ECF No. 179-2, Ex. M at 36:2–39:13), and (2) email traffic between NSL's CEO and a foreign actor not before the Court. *See* (ECF No. 189 *SEALED* at 509–881). This evidence simply cannot raise a genuine dispute as to NSL's responsibility (or Indra's liability) for the calls to Nock.

Even if Nock's evidence raised a genuine dispute as to whether the calls were made by NSL, Nock has not proffered sufficient evidence from which a jury could find Indra vicariously liable under any theory of agency liability. "[V]icarious liability under the TCPA is governed by the federal common law of agency," under which an agency relationship may be established by way of (1) actual authority; (2) apparent authority; or (3) ratification." *Discount Power*, 2022 WL 3100762, at *5 (quoting *Hodgin v. UTC Fire & Sec. Am. Corp., Inc.*, 885 F.3d 243, 252 (4th Cir. 2018)). Nock advances all three theories of vicarious liability. *See* (ECF No. 183 at 25–32). None of those theories succeeds. The Court addresses each in turn.

First, Nock alleges that NSL was an agent of Indra with either actual or apparent authority. Even assuming NSL made the calls at issue, no such principal-agent relationship exists between Indra and NSL that would authorize NSL to telemarket on Indra's behalf. To determine whether an agency relationship exists, the Court considers three elements: "(1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent." *Danner v. Int'l Freight Sys. of Wash., LLC*, 855 F. Supp. 2d 433, 454 (D. Md. 2012) (quoting *Green v. H & R Block, Inc.*, 355 Md. 488, 503 (1999)).

Nock cites the Agreement between Indra and NSL in support of his actual authority argument. *See* (ECF No. 179-5, Ex. A § 1(a)). He suggests that the degree of control those agreements afford to Indra evidences an agency relationship. *See* (ECF No. 183 at 26–27). However, here, the Agreement between Indra and NSL provided that NSL was an independent contractor with no authority to bind Indra by acting on Indra's behalf. *See* (ECF No. 179-5, Ex. A § 9(a)). The Agreement also strictly limits NSL's authority to "perform[ing]

door to door solicitations of prospective customers on behalf of Indra," and it does not authorize NSL to telemarket on Indra's behalf. (*Id.* § 1(a)). Furthermore, the Agreement expressly confers responsibility for "directing and controlling the performance of the task and the scope of the work (including but not limited to the training and supervision of [NSL's] employees . . .)" on NSL, while reserving for Indra only the right to require NSL's that employees pass a background check, carry a badge, and wear an Indra-approved uniform. (*Id.* §§ 9(b), 9(d)–(f)).

The broad control NSL retained over its employees' conduct demonstrates that NSL is properly classified as an independent contractor of Indra, not an agent. Although Indra retained some control over NSL's employee's attire and hiring requirements, "the reservation of some control over the manner in which the work is done does not destroy the independent contractor relationship where the contractor is not deprived of his [or her] judgment in the execution of his [or her] duties." *Worsham v. Direct Energy Servs., LLC*, No. SAG-20-00193, 2021 WL 948819, at *6 (D. Md. Mar. 12, 2021) (quoting *Brooks v. Euclid System Corp.*, 151 Md. App. 487, 506–07, 827 A.2d 887, *cert. denied*, 377 Md. 276, 833 A.2d 31 (2003)). Thus, "[w]here, as here, the parties' agreement gives the telemarketing entity the ability to 'control [its] employees' as well as 'the right to control [its] conduct,' the degree of control needed for an agency relationship is lacking." *Id.* (quoting *Brooks*, 151 Md. App. at 508–09, 827 A.2d 887).

Nock also argues that the Court must look beyond the written Agreement to Indra's conduct in assessing whether a principal-agent relationship exists. (ECF No. 183 at 27–28). Nock contends that Indra permitted either NSL or AJ Solutions to enroll customers remotely using a VPN, gave them access to Indra's IDNC list, kept the fraudulent enrollments, and

continued to business for NSL afterwards. (*Id.* at 27). However, Nock produces no evidence that Indra retained on its rolls consumers who were fraudulently enrolled remotely from Pakistan, and the only evidence before the Court is that Indra *did* immediately deactivate the NSL subcontractor responsible for the errant enrollment then canceled the fraudulent enrollment altogether.[19] *See* (ECF No. 179-2, Ex. L at 170:14–173:2); (ECF No. 179-2, Ex. M. at 36:2–39:3); (ECF No. 179-2, Ex. P); (ECF No. 179-4 ¶¶ 5–7). Given Indra's swift remedial action, and the absence of evidence of Indra's inaction as to other fraudulent enrollments, a reasonable jury could not conclude that Indra acquiesced in NSL's alleged telemarketing activities.[20]

Next, Nock contends that either NSL or AJ acted on Indra's behalf with apparent authority when it made the calls to him. An agent has apparent authority to bind a principal

---

[19] Nock acknowledges directly below this argument in his Opposition (ECF No. 183) that Indra did in fact "terminate the strawman" NSL subcontractor after the fraudulent enrollment occurred. (ECF No. 183 at 27).

[20] Nock also cites *Krakauer v. DISH Network, LLC*, 925 F.3d 643, 660 (4th Cir. 2019) at length in support of his argument that Indra's conduct indicating acquiescence should establish an agency relationship here. However, Nock's near-total reliance on *Krakauer* is inapposite given that the facts and procedural posture of *Krakauer* differ greatly from this case. In *Krakauer*, the Fourth Circuit affirmed a jury verdict which found, *inter alia*, that Dish was liable for its third-party vendor's telemarketing activities. 925 F.3d at 659–660. First, the Fourth Circuit found that the district judge properly instructed the jury on the law governing agency, so Dish's challenge was more appropriately framed as a challenge to the jury's factual determination that the third-party vendor was in fact Dish's agent. *Id.* at 660. And to prevail on an appeal of a jury's factual determination, Dish was required to show that the jury's conclusion "lack[ed] any meaningful support, viewing the trial evidence in the light most favorable to the prevailing party." *Id.* at 660 (quoting *Roe v. Howard*, 917 F.3d 229, 231 (4th Cir. 2019)). Thus, the bar to overturn a factual finding in that posture is high, and the evidence needed to sustain the finding is low. Second, the plaintiff-class in *Krakauer* proffered more evidence to demonstrate the existence of an agency relationship between Dish and its third-party telemarketing vendor than Nock has proffered here. *See Krakauer*, 925 F.3d at 660. Specifically, the jury heard the following evidence: (1) that Dish retained "broad authority" over the third party's business, (2) that Dish entered into a Voluntary Compliance Agreement with 46 state attorneys general in which "Dish clearly stated its authority over [the specific third-party vendor at issue] with regard to TCPA compliance," and (3) "an array of witnesses testified that Dish was aware of [the vendor's] legal violations, took no meaningful action to ensure compliance, and profited from the vendor's actions. *Id.* Here, by contrast, Indra did not retain broad authority over NSL's business (and NSL was not authorized to telemarket in any event), Indra has made no similar statement or agreement concerning its liability for activities of NSL that may implicate the TCPA, and Nock has not produced witnesses, whether employees of Indra/NSL or consumers, who can testify to Indra's chronic failure to act to stop NSL's illicit telemarketing.

if a third party reasonably believes the agent has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations. *Bradley v. DentalPlans.com*, 617 F. Supp. 3d 326, 343 (D. Md. 2022). A principal's manifestations to create apparent authority "may take many forms" and "do not require a principal's direct communication with a third party." *Id.* (citing RESTATEMENT (THIRD) OF AGENCY § 2.03).

Nock asserts that NSL or AJ's ability to enroll consumers in Indra's services could lead consumers to reasonably believe that the calls were on behalf of Indra, based on the caller's mention of Indra and their ability to send a link to Indra's contract should the consumer choose to enroll. (ECF No. 183 at 30). Nock cites *In the Matter of the Joint Petition Filed by DISH Network, LLC*, Declaratory Ruling, FCC 13-54, 28 FCC Rcd 6574 (May 9, 2013) for support.

First, the Court reiterates that, in the absence of class certification, this case concerns the three specific calls made to Nock, only the last of which mentioned Indra. *See* (ECF No. 179-2, Exs. B, D, F). In the call that did mention Indra, the caller *specifically* tells Nock, "[J]ust remember, my company calls you tomorrow and they will . . . ask you some questions and you need to say yes only. And the company is Indra Energy, okay?" (ECF No. 179-2, Ex. F). Even if the caller stated that they represent Indra, the caller's instruction to Nock suggests that whatever activity the caller engaged in during the call was not authorized by Indra or done with Indra's knowledge. It would not be reasonable for Nock to draw a different conclusion, and Nock's evidence of the third call is not sufficient to generate a genuine dispute as to NSL's authority even if he could prove NSL made the call.

More to the point, Nock selectively quotes the FCC's Ruling to argue that "[t]he ability by the outside sales entity to enter consumer information into the seller's sales or customer

systems" conclusively establishes apparent authority. *See In re Dish Network*, 28 FCC Rcd. At 6592 ¶ 46; (ECF No. 183 at 30). However, this is a plain misstatement of the FCC's decision. Nock's quoted material appears in a paragraph which begins with, "[t]o provide guidance in this area, we find that the following are *illustrative examples* of evidence that *may* demonstrate that the telemarketer is the seller's authorized representative with apparent authority." *See In re Dish Network*, 28 FCC Rcd. At 6592 ¶ 46 (emphasis added). Similarly, the FCC clarifies that the example Nock quotes, of an outside sales entity's ability to enter information into the seller's sales systems, "*may* also be *relevant*" to a court's analysis of apparent authority. *Id.* (emphasis added). Thus, NSL's ability to access Indra's enrollment systems is at most a factor that could give rise to a finding of apparent authority. However, even if Nock proved that NSL made the third call, a reasonable jury could not conclude that NSL was acting with apparent authority in light of the the caller's clear indication that they were engaging in unauthorized behavior.

Finally, there is no evidence from which a reasonable jury could conclude that Indra ratified the calls at issue here through knowledge and inaction. As in *Worsham v. Direct Energy Services*, Nock's "inability to identify the caller makes proof of ratification impossible" as the calls here "may not have even derived from a 'third party [] that is otherwise authorized to market'" on Indra's behalf—NSL. No. SAG-20-0193, 2021 WL 948819, at *5 (D. Md. Mar. 12, 2021) (quoting *In the Matter of the Joint Petition Filed by DISH Network, LLC*, Declaratory Ruling, FCC 13-54, 28 FCC Rcd 6574 (May 9, 2013)).

Furthermore, the facts of this case present a weaker claim for ratification than in *Direct Energy*. In *Direct Energy*, Direct Energy's third-party contractors were explicitly contracted to

*telemarket* on behalf of Direct Energy; however, Direct Energy could not be held vicariously liable because, *inter alia*, there was no evidence Direct Energy knew any of its telemarketers were violating the TCPA on its behalf. *See Direct Energy*, 2021 WL 948819, at *2, *5. Here, on the other hand, Indra's agreement with NSL strictly limits NSL's authority to the execution of D2D sales. *See* (ECF No. 179-5, Ex. A § 1(a)). Although NSL was responsible for a single remote D2D enrollment, the Court's understands that the remote enrollment was a violation of Indra's internal D2D enrollment standards, not an inherent violation of the TCPA, and Indra promptly cut ties with the NSL actor thereby negating any claim of inaction. Thus, the possibility that Indra had knowledge of NSL's impermissible telemarketing and failed to act is foreclosed by its prompt remedial action, and in any event, is even more remote than in *Direct Energy*, 2021 WL 948819, at *2, where the third-party vendors were specifically contracted to telemarket.

In sum, Nock has failed to adduce evidence from which a reasonable jury could conclude that Indra is vicariously liable for any of the three calls he received. Accordingly, Indra is entitled to summary judgment on Count I.

**B. Count II**

Under Count II, Nock further contends that the calls violated 47 C.F.R. § 64.1200(d)(1) and (2).[21] because, at the time the calls were made, Indra failed to maintain internal do-not-call

[21] To the extent that Nock also seeks to state a claim for violation of § 64.1200(d)(4), he lacks a private right of action. As Judge Bredar of this Court explained in *Worsham v. Travel Options, Inc.*, No. JKB-14-2749, 2016 WL 4592373, at *7 (D. Md. Sep. 2, 2016), § 64.1200(d)(4) sets procedural standards and therefore falls within the ambit of the TCPA's subsection d, for which no private right of action exists. Thus, this Court does not analyze Nock's arguments concerning alleged violations of § 64.1200(d)(4). *See* (ECF No. 28 ¶ 121).

("IDNC") lists or train its personnel to use an IDNC list.[22] *See* (ECF No. 28 ¶¶ 118–124). Section 227(c)(5) of the TCPA contains a safe harbor provision which creates an affirmative defense when the TCPA defendant "has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection."

In their Motion for Summary Judgment, the Indra Defendants argue that Nock's IDNC claim under Count II fails on two grounds: (1) Nock did not have standing to sue for a violation of this subsection because he never made a do-not-call ("DNC") request to Indra; and (2) even if Nock had made a DNC request to Indra, Indra complied with the safe harbor provision such that it has an affirmative defense to Nock's claim. *See* (ECF No. 179-1 at 20–21). The Court addresses each argument in turn.

With respect to standing, the Court has not found any controlling Fourth Circuit precedent that speaks to the question of whether a TCPA IDNC plaintiff must make a formal DNC request to the defendant-entity in order to have standing to sue under this subsection. However, the Indra Defendants cite *Cordoba v. DIRECTV*, 942 F.3d 1259, 1271–72 (11th Cir. 2019) in support of their contention that Nock lacks standing to sue. In *Cordoba*, the Eleventh Circuit held that putative IDNC class members who did not ask DIRECTV's subcontractor to stop calling them lacked standing to sue because their injury from the receipt of additional telemarketing calls would not be "fairly traceable to the challenged action of the defendant."[23]

[22] Nock's First Amended Complaint also alleges a second violation of 47 U.S.C. § 227(c)(5) under Count II. *See* (ECF No. 28 at 23). As this Court has already analyzed the merits of Nock's § 227(c)(5) claim as to all three calls under Count I, the Court does not repeat that analysis here.

[23] The Eleventh Circuit also notes in dicta that the failure to ask the defendant-entity to stop calling is "not a problem for the class based on calls made to individuals on the National Do Not Call Registry," because "if [the subcontractor] had followed the law and not called numbers on the Registry, they would not have been

942 F.3d at 1271–72 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In the Eleventh Circuit's view, "there's no remotely plausible causal chain linking the failure to maintain an internal do-not-call list to the phone calls received by class members who never said to [the subcontractor] they didn't want to be called again." *Id.* at 1272.

The Court agrees with the Eleventh Circuit's analysis and concludes that a DNC request to the defendant-entity is a prerequisite for standing to sue under 47 C.F.R. § 64.1200(d). Accordingly, whether Nock has standing to sue turns on whether he made a DNC request directly to Indra.

In support of his contention that he possesses standing to maintain his IDNC claim, Nock directs the Court's attention to the first call, in which Nock says to a caller identified as "Happy," "don't ever call me again, okay? Stupid asshole." *See* (ECF No. 183, Ex. 167 (on file with chambers)); (ECF No. 179-1 at 7). However, as noted in this Court's analysis of Count I, there is no indication that this call was made by Indra—the caller identifies themselves as "Happy" only, and there is no discussion of Indra or the sale of energy services. *See id.* Relatedly, the first call was the only call made to Nock's cellular telephone line; the second two calls were made to Nock's landline, which is a different phone number. *See* (ECF No. 28 ¶ 62). Thus, even if Nock's statement during the first call was construed as a DNC request made directly to Indra, the absence of additional calls to Nock's cellular telephone line would indicate that the request *was* honored.

---

injured." *Cordoba*, 942 F.3d at 1271. Although the Court's wording is slightly ambiguous, this Court construes the Eleventh Circuit to mean that failure to ask the defendant-entity to stop calling would not defeat standing for plaintiffs in the separate National DNC class who, despite not making an internal DNC request, were still registered on the National DNC Registry. Accordingly, although Nock has registered both his cellular telephone number and landline number on the National DNC Registry, that fact does not alter the Court's analysis of his IDNC claim under Count II. *See* (ECF No. 188 *SEALED* at 23).

Furthermore, even if Nock possessed standing to sue, the Indra Defendants have sufficiently demonstrated that Indra's internal control mechanisms satisfy § 227(c)(5)'s safe harbor provision, and Nock has failed to identify a genuine dispute of fact on this point. As noted above, the TCPA's safe harbor provision shields from liability an IDNC defendant that has "established and implemented . . . reasonable practices and procedures to effectively prevent telephone solicitations." 47 U.S.C. § 227(c)(5). In support of their safe harbor argument, the Indra Defendants point to Indra's written do-not-call policy ("Indra's IDNC Policy"), *see* (ECF No. 189 *SEALED at 10–11), and further submit the declaration of Indra's Chief Marketing Officer, Jeff Rodgers, which outlines additional measures. *See* (ECF No. 179-4).

At the outset, Indra's IDNC Policy states that its purpose is "[t]o provide steps for handling Do Not Call (DNC) requests," and it directs readers to "[f]ollow these guidelines when a customer states they want to stop receiving calls." *See* (ECF No. 189 *SEALED at 10–11). The Policy then sets forth the following list of steps under the subheading "Call Handling Guidelines": (1) "[a]cknowledge the caller's frustration about the contact from Indra Energy," (2) "[r]eassure the caller right from the start that you will help them with their request," and (3) "[p]robe the caller to gather as much information [as] possible to complete the Do Not Contact request." (*Id.*). Within each step are subpoints which provide additional direction to Indra employees. (*Id.*). The Policy then ends with the directive, "[o]nce you have enough information, add the customer to the Do Not Call / Do Not Contact list." (*Id.*). Also of note, the Policy is dated 01/13/2021, meaning it existed when Nock received the calls at issue in this case. (*Id.*).

In addition to Indra's IDNC Policy, Indra's Chief Marketing Officer, Jeff Rodgers, avers that "individuals placing calls on behalf of Indra are instructed about how the do-not-call policy works and are given a copy of the policy, which explains how to place individuals on the internal do-not-call list." (ECF No. 179-4 ¶ 7). Mr. Rodgers adds that Indra "honors all do-not-call requests" by placing individuals who so request on its IDNC list, and Indra "maintains a record of all requests not to be contacted," which it "honors [] unless and until someone affirmatively requests to be contacted at that number." (*Id.* ¶¶ 8–9). Finally, Mr. Rodgers explains that "Indra also subscribes to the national and Maryland do-not-call registries and regularly scrubs its outbound calling list against them." (*Id.* ¶ 12).

In response to Indra's argument that its IDNC procedures are reasonable, Nock contends that "AJ and NSL" enrolled 23 consumers with telephone numbers already listed on Indra's IDNC list.[24] (ECF No. 183 at 24). To support this contention, Nock points to Indra's IDNC list through June 29, 2021, as well as TPV.com's records for Indra enrollments by NSL subcontractors between April and July 2021. (*Id.*); *see also* (ECF No. 183, Exs. 91 & 124 (on file with chambers)). In the Court's view, the 23 consumers who appear on both lists is

[24] Nock also argues that the determination of whether Indra's IDNC procedures are reasonable should be left for trial, citing the undersigned's opinion in *Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F. Supp. 2d 492 (D. Md. 2004). In *Akalwadi*, this Court denied summary judgment to the defendant on the issue of whether it was entitled to protection under the Fair Debt Collections Practices Act's ("FDCPA") Bona Fide Error Rule, *see* 15 U.S.C. § 1692k(c), which requires a debt collector to demonstrate that it maintains procedures "reasonably adapted" to avoid the FDCPA violation alleged. 336 F. Supp. 2d at 504. In denying summary judgment, the Court quoted another District Court's observation that "[t]he inquiry into whether a debt collector's procedures are reasonable is, 'by its nature, fact-intensive, and should therefore typically be left to the jury.'" *Id.* (quoting *Gill v. Kostroff*, 82 F. Supp. 2d 1354, 1360 (M.D. Fla. 2000), in turn quoting *Narwick v. Wexler*, 901 F. Supp. 1275, 1282 (N.D. Ill. 1995)). Nock's reliance on *Akalwadi* is misplaced. The Court is not presently reviewing the reasonableness of debt collection practices as it was an *Akalwadi*, or an FDCPA claim for that matter. Even so, Indra has produced sufficient evidence to demonstrate that its IDNC procedures are reasonable, and as explained below, Nock has failed to show that a genuine dispute remains on that issue.

insufficient to generate a genuine dispute as to the reasonableness of Indra's IDNC procedures for several reasons.

First, many of the 23 consumers Nock identifies were placed on Indra's IDNC list several years before their enrollment, and the fact that those consumers later enrolled in Indra's services is entirely consistent with the consumer changing their mind during that time.[25] *See* (ECF No. 183, Ex. 124 (on file with chambers) (IDNC list row 50431, added July 3, 2018; row 49468, added August 7, 2018; row 33351, added October 31, 2019; and row 31475, added January 21, 2020)). This is particularly so because consumers must provide their express consent to enroll in Indra's services, *see* (ECF No. 179-2, Ex. H at 21:3–17), and there is no allegation (or evidence) that the 23 consumers here were enrolled without their authorization. *See* (ECF No. 183 at 24). Second, some enrollments by numbers previously placed on the IDNC list is understandable given that Indra's IDNC Policy permits subcontractors to reinitiate contact if the consumer affirmatively consents. *See* (ECF No. 179-4 ¶ 9). Third, Indra's IDNC list contained 60,609 phone numbers as of June 29, 2021. *See* (ECF No. 183, Ex. 124 (on file with chambers)). Although the Court is cognizant that the TPV.com enrollment data spans only three months, the fact that just 23 consumers out of over 60,000 were enrolled during this period would not be sufficient to raise a genuine dispute

---

[25] Nock also argues that the fact that consumers previously placed on the IDNC list were later enrolled by NSL's subcontractors indicates NSL had access to Indra's IDNC list, despite being contracted to execute D2D sales only. (ECF No. 183 at 24). The Court disagrees. If anything, the fact that NSL subcontractors contacted consumers placed on Indra's IDNC list suggests that NSL *did not* have access to the IDNC list and thus were not aware of the consumers preference not to be contacted by Indra. Plus, the TPV.com enrollment records indicate that the consumers Nock identifies were enrolled in Indra's D2D channel, further reducing the concern that NSL was improperly accessing systems reserved for telesales. *See* (ECF No. 183, Ex. 91)

as to the reasonableness of Indra's IDNC procedures even if there were no innocent explanations for the enrollments.

In sum, Nock does not have standing to pursue an IDNC claim under the TCPA, but even if he did, Indra has established its affirmative defense under the TCPA's safe harbor provision, and Nock has not demonstrated that a genuine dispute remains for trial. Accordingly, Indra is entitled to summary judgment on Count II.

### C. Count III

In Count III of his Amended Complaint (ECF No. 28), Nock asserts that the calls he received violated the TCPA's prohibition on calling cellphones or landlines using an "artificial or prerecorded voice." (ECF No. 28 ¶¶ 125–130); *see also* 47 U.S.C. § 227(b)(1)(A)–(B).[26] Liability under this section of the TCPA requires that the "artificial or prerecorded voice [] *actually play*" during the call. *Ybarra v. Dish Network*, 807 F.3d 635, 640 (5th Cir. 2015). The burden is on Nock to demonstrate that an artificial or prerecorded voice actually played during the calls at issue. *See Worsham v. Direct Energy Servs., Inc.*, No. SAG-20-00193, 2021 WL 948819, at *4 (D. Md. Mar. 12, 2021) (noting plaintiff "bears the burden of proof on the issue" and "has failed to carry that burden because the eleven calls he identifies do not involve any prerecorded devices or messages").

[26] In his Amended Complaint, Nock pleads Count III as a violation of 27 U.S.C. § 227(b)(1)(B), which prohibits calls made to "any residential telephone line using an artificial or prerecorded voice." *See* (ECF No. 28 ¶¶ 125–130). However, Nock received the first call at issue on his cellphone. (ECF No. 179-1 at 7). As a result, on November 3, 2026, Nock moved to amend his complaint to add a claim under 27 U.S.C. § 227(b)(1)(A)(iii), which prohibits calls made cellular telephones "using any automatic dialing system or an artificial or prerecorded voice." Although this Court denied Nock's request for leave to amend his complaint, *see* (ECF No. 205), the Court has noted Nock's deposition testimony which clarifies that his cellphone is used for personal and/or residential purposes. *See* (ECF No. 179-2, Ex. G at 41:9–43:17). Accordingly, in fairness, the Court construes Count III on the merits as to all three calls.

Here, the Court has listened to recordings of all three calls made to Nock, and there is no artificial or prerecorded voice that plays on any of the three calls at issue. (ECF No. 183, Exs. 167, 209, 213 (on file with chambers)); *see also* (ECF No. 179-1 at 7). In the first call, a live caller says, "Yeah, hello, this is happy. How are you?," to which Nock responds by cursing and hanging up. *See* (ECF No. 183, Ex. 167 (on file with chambers)); (ECF No. 179-1 at 7). The second call consists only of background noise and a live caller stating "Frederick Johnson." *See* (ECF No. 183, Ex. 209 (on file with chambers)); (ECF No. 179-1 at 7). And in the third call, a live caller and Nock participate in an eight-minute conversation during which no artificial or prerecorded voice plays. *See* (ECF No. 183, Ex. 213 (on file with chambers)); (ECF No. 179-1 at 7).

In an attempt to avoid this straightforward conclusion, Nock argues that his deposition testimony about a prerecorded voice playing in *other* calls not at issue here is sufficient to raise a factual question for the jury. *See* (ECF No. 183 at 21–22); *see also* (ECF No. 179-2, Ex. G at 56:15–58:13) (testifying that "all calls from Indra started the same way with a recording" which apologized for an overcharge to the recipient's electric bill, informed the recipient they were due a rebate, and directed the recipient to press one to receive the rebate)). That a prerecorded voice played on other telemarketing calls Nock received is incapable of generating a dispute of fact for a claim which relates to three specific calls on which an artificial or prerecorded voice did not play.

Although Nock correctly notes that uncorroborated testimony of the non-movant can withstand summary judgment, *see Kubas v. 331B, LLC*, No. MJM-20-2456, 2022 WL 4608147, at 10 (D. Md. Sep. 30, 2022), Nock misconstrues the legal principle reiterated in *Kubas*. When

faced with the uncorroborated testimony of two fact witnesses, as was the case in *Kubas*, the decision of whether to credit one witness over the other cannot be made on summary judgment and must be left for the jury. 2022 WL 4608147, at *10. Here, Nock's uncorroborated testimony is directly contradicted by recordings of the calls which clearly do not contain an artificial or prerecorded voice. The call recordings are dispositive, and Indra is entitled to judgment as a matter of law on Count III.

Having found that Indra is entitled to summary judgment on Counts I–III, the Court also concludes that Indra is entitled to summary judgment on each of Nock's MDTCPA claims under Counts IV–VI, as each MDTCPA claim requires a predicate TCPA violation. *See Direct Energy Servs.*, 2021 WL 948819, at *3–4; MD. CODE ANN., COM. LAW § 14-301.

**CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 179) is GRANTED as to all claims.

A separate Order follows.

Date: November 16, 2026

/s/
Richard D. Bennett
United States Senior District Judge